UNITED STATES of America, Appellant,

v.

**Ralph CECCOLINI, Defendant-Appellee.**

**No. 1125, Docket 76–1091.**

United States Court of Appeals, Second Circuit.

Argued June 8, 1976.

Decided Sept. 15, 1976.

---

Peter D. Sudler, Sp. Atty., U. S. Dept. of Justice, New York City (Michael D. Abzug, Sp. Atty., U. S. Dept. of Justice, Robert B. Fiske, Jr., U. S. Atty., Southern District of New York, New York City, Steven A. Schatten, Asst. U. S. Atty., on the brief), for appellant.

Joel Martin Aurnou, White Plains, N. Y. (Greenspan & Aurnou, White Plains, N. Y., on the brief) for appellee.

Before KAUFMAN, Chief Judge, and FEINBERG and VAN GRAAFEILAND, Circuit Judges.

FEINBERG, Circuit Judge:

This admirably argued case comes to us in an unusual procedural posture. After a

non-jury trial in the United States District Court for the Southern District of New York on two counts charging perjury before a grand jury, 18 U.S.C. § 1623, Judge Lee P. Gagliardi found defendant Ralph Ceccolini not guilty on one count and guilty on the other. But the judge then immediately set aside the guilty verdict on the ground that essential testimony against defendant had to be suppressed as the fruit of an illegal search. Citing 18 U.S.C. § 3731 and 28 U.S.C. § 1291, the Government appeals and argues that the judge erred in suppressing the evidence and setting aside the verdict. Appellee Ceccolini contends that the Double Jeopardy Clause bars the Government's appeal and, even if that is not so, that the judge's ruling was correct. We reject the former contention, but agree with the latter. Therefore, we affirm.

## I.

The relevant facts are as follows. In the second half of 1973, federal authorities conducted an investigation of gambling in North Tarrytown, New York. Surveillance by federal agents included various stores, including defendant Ceccolini's Sleepy Hollow Flower Shop, which were frequently visited by Francis J. Millow, a target of the investigation. In this period, the agents did not question any employee of any of these businesses. Surveillance was discontinued in December 1973.[1]

On December 18, 1974, North Tarrytown Police Officer Ronald Biro entered the flower shop merely, according to Biro, to enjoy a cigarette break. He went into the part of the shop customarily used only by employees, where he noticed on the cash register an envelope with some money sticking out. Biro picked up the envelope, examined its contents, saw that it contained currency and policy slips, and replaced it. Lois Hennessy, an employee, was present while this was going on. Biro did not tell Miss Hennessy what he had seen in the envelope but did ask her questions about it. Miss Hennessy told Biro that Ceccolini had told her to give the envelope to someone.

Within 24 hours, Biro notified North Tarrytown detectives who, in turn, informed Lance Emory, an FBI agent who had participated in the gambling investigation. About four months later, Emory interviewed Miss Hennessy at her home for about 20–30 minutes. At the time, Emory was under the impression that Biro's activities had been entirely legal. Miss Hennessy related the events of the December 18, 1974 incident to Emory. Thereafter, defendant Ceccolini was subpoenaed before the grand jury and testified that he had never taken policy bets at his flower shop for Francis J. Millow. The following week, Miss Hennessy gave contradictory testimony before the grand jury; shortly afterwards, Ceccolini was indicted on the perjury charge now the subject of this appeal.[2]

Ceccolini made several motions in preparation for trial. In July, the district judge granted various requests for discovery; the Government did not comply until the end of September, shortly before the scheduled trial date. The Government's list of witnesses included Officer Biro, and when the defense interviewed him, it learned for the first time of Biro's December 18, 1974 search. At the start of the trial, defendant orally moved to suppress testimony, including Miss Hennessy's, derived from Biro's search,

---

1. Although surveillance of the stores was discontinued, on December 3, 1974, a telephone conversation between Millow and Ceccolini, implicating the latter in a betting operation, was intercepted by local police officers participating in a combined federal-state gambling investigation.

2. This was Count 1 of the indictment. Count 2 charged that Ceccolini had made a false statement to the grand jury when he testified that he did not know that Hank Bucci was involved in gambling operations. Judge Gagliardi found defendant not guilty on this count because

> although there is evidence to support this charge the government has not met its burden of proof beyond a reasonable doubt. The defense did establish the possibility that Hank Bucci, who had several previous gambling convictions, was not known by the defendant to be currently involved in gambling at the time the question was asked.

but acceded to the judge's suggestion that the hearing on the motion proceed simultaneously with the non-jury trial. Thereafter, the judge heard testimony from Officer Biro, Agent Emory and others. At the close of the Government's case, defendant moved for a directed verdict, which was denied. Defendant testified in his own behalf and called other witnesses. The judge, as the trier of fact, reserved decision until after considering a memorandum of law submitted by the Government on the suppression of Miss Hennessy's testimony.

Several months later, the judge in open court pronounced the defendant guilty on Count 1 but then immediately stated his assumption that the defendant's prior motion for a directed verdict included "a motion now . . . to set aside the verdict of guilty on Count 1." Defendant's counsel quickly acquiesced, and the judge then gave an oral opinion in which he first granted the motion to suppress Miss Hennessy's testimony and then set aside the verdict for insufficient evidence. Some colloquy followed in which defense counsel said that the testimony should have been suppressed before the verdict, in which event the Double Jeopardy Clause would have barred government appeal. The judge disagreed and confirmed this view in a later memorandum opinion, which stated, in relevant part:

> In light of the serious legal issues raised by the motion to suppress—particularly on the question of taint—it was this court's explicit intention that the government have the right to appeal an adverse decision on that issue. 18 U.S.C. § 3731 clearly contemplates that the government be permitted to appeal trial court rulings which do not place a defendant in double jeopardy. Here Ceccolini was found guilty on the basis of all the evidence presented to this court. His conviction was set aside because evidence adduced at trial indicated that the testimony of the government's key witness was tainted by an illegal search. The hearing on the motion to suppress was

consolidated with the trial for the convenience of the court, counsel and the witnesses, without objection by Ceccolini. Furthermore in this case the issue of taint was sufficiently uncertain that had there been a jury trial, the court would have let the Hennessy testimony go to the jury and then ruled on the motion to exclude it in the event Ceccolini was convicted. Under those circumstances, the government would then have had the right to appeal this court's ruling. There is no reason why the government should be deprived of this opportunity because the case was tried without a jury.

This appeal by the Government followed.

## II.

Ceccolini renews his argument that under the circumstances of this case the Double Jeopardy Clause precludes a government appeal. He claims that the judge should have ruled on the admissibility of Miss Hennessy's testimony before deciding the ultimate issue of guilt or innocence. Had the judge done that, he would have had to acquit because the evidence was otherwise insufficient to convict, as the judge found. Since the Government could not have appealed from such a judgment, it should not be able to do so now.

The argument is correct as far as it goes but it does not go far enough. The judge could have followed the suggested procedure but it was not the only possible alternative. The judge could also have ruled on the motion to suppress prior to the start of the trial. If he had followed that course and reached the same result, the Government points out to us, it could have immediately appealed under 18 U.S.C. § 3731 to test the suppression ruling. We are aware that Ceccolini did not know until just before trial about Biro's search and his connection with the Hennessy testimony and so could not have moved sooner.[3] We also realize that such a motion would have required a separate evidentiary hearing. But in a non-jury case such potential duplication of testimony is often eliminated at trial, if

---

3. Judge Gagliardi so found.

the motion to suppress is denied, by allowing the record of the suppression hearing to be used at trial. That procedure would have been preferable to the one followed here. See *United States v. Birrell,* 470 F.2d 113, 115 (2d Cir. 1972).

■ In any event, we agree with the district judge and the Government that the course followed here did not deprive it of the right to appeal. The judge as trier of fact first found defendant guilty and then granted defendant's motion to set aside the guilty verdict. In *United States v. De Garces,* 518 F.2d 1156 (2d Cir. 1975), the same sequence occurred and we held, on the authority of *United States v. Jenkins,* 420 U.S. 358, 365, 368, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), that the Government could appeal. The trier of fact in *De Garces* was a jury and here it was a judge, but the distinction is not controlling. If the Government's position on the merits is correct, "a retrial would not be required." *United States v. Jenkins, supra,* 420 U.S. at 365, 95 S.Ct. at 1011, citing *United States v. Wilson,* 420 U.S. 332, 344–45, 352–53, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). In *De Garces,* since the Government's position on the merits was correct, we merely vacated the judgment of acquittal granted by the judge after the guilty verdict and remanded the case to the district court with directions to reinstate that verdict. If the Government were correct here on the merits, we would follow the same procedure.[4] This appeal is not offensive to the Double Jeopardy Clause.

### III.

■ We turn now to the merits of the Government's appeal. The most damning

evidence on Count 1 was the testimony of Lois Hennessy that, while she was an employee at the flower shop, she saw customers place bets with Ceccolini and that she knew these bets were turned over to Millow. Although Miss Hennessy's testimony was corroborated, the judge was correct in holding that without it there was insufficient evidence to convict defendant. The more difficult issue is whether that testimony had to be suppressed as the product of Officer Biro's unlawful search.[5] The Government offers a number of reasons why suppression was inappropriate.

■ The Government's most substantial argument is that its investigation would have produced Lois Hennessy's testimony even if the December 18, 1974 search had never occurred. It relies upon a line of cases, exemplified by *United States v. Falley,* 489 F.2d 33, 40–41 (2d Cir. 1973), for the proposition that the taint from an unlawful search is removed if independent investigation would have led to the evidence in question in any event. See also, e. g., *United States v. Capra,* 501 F.2d 267, 280 n.12 (2d Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975); *United States v. Cole,* 463 F.2d 163, 171–74 (2d Cir.), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972). However, Judge Gagliardi was aware of this doctrine, specifically referred to the *Falley* decision twice in his oral ruling setting aside the guilty verdict, and found that:

[T]he government has failed to show by the fair preponderance of the evidence that Lois Hennessy's knowledge of Ceccolini's gambling operations and her willingness to cooperate with the FBI was the normal output of the investigation

---

4. *Cf. United States v. Fayer,* 523 F.2d 661, 664 (2d Cir. 1975).

5. The Government conceded at oral argument that Officer Biro's search was illegal, although its brief does note that "there is at least some question" whether Ceccolini can complain of the "Fourth Amendment violation" because he was not present at the time and had transferred "an apparently open envelope to Miss Hennessy," who "would appear to have been authoriz-

ed to permit perusal of the envelope in the manner that occurred." Brief of the United States of America, at 9*. To the extent the argument is being pressed, we reject it. The point was not raised in the trial court, there is no evidence that Miss Hennessy had authority to show it to anyone but Millow, and Biro apparently searched in the envelope without anyone's permission.

which was in progress at the time of the illegal search. Therefore, . . . the *Falley* case . . . cannot be relied on here to purge the Hennessy testimony of the taint resulting from the illegal search on December 18th.

On this ultimate issue, the question is whether Judge Gagliardi's finding was clearly erroneous or embodied an error of law. See *United States v. Schipani,* 414 F.2d 1262, 1266 (2d Cir. 1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970).

■ The Government presses a number of contentions on appeal that are primarily factual. Most of them were argued to the trial judge, who found as follows:

The government contends that since Lois Hennessy was employed in the shop which was already under surveillance the FBI would have inevitably discovered her existence and obtained her testimony for this trial without the illegal search.

I do not agree. Agent Lance Emory, special agent for the FBI in charge of the case, had already stated in response to a question by me that Lois Hennessy came to his attention because of the December 18th incident involving Officer Biro and because she was an employee of the shop. It is thus clear that the illegal search was at least in part the actual source of the government's information that Lois Hennessy would be an important witness about Ceccolini's gambling activities, and that prior to the search the government's attention had not focused on her in that capacity.

While certainly it is possible, perhaps even probable, that the FBI would have interviewed Miss Hennessy later in the course of the gambling investigation, I do not believe that the government has sustained its burden of proving by a fair preponderance of the credible evidence that it would have inevitably come across her in the course of its investigation.

At the time she was interviewed no other employee of Ceccolini's flower shop had been interviewed by the FBI. While it is true that other employees were subsequently interviewed and called before the grand jury, it is not entirely clear that the investigation would have focused on the employees of the flower shop at all were it not for the illegal search and the favorable response of Lois Hennessy to the FBI interview.

Under these circumstances the government's assertion that any taint resulting from the illegal search is purged by the fact that the Hennessy testimony would have been inevitably discovered by the FBI must fail.

These findings were amply supported by the record.

The Government emphasizes to us that since surveillance of the flower shop and an intercepted telephone call both occurred prior to the illegal search, the latter did not initiate the gambling investigation that led to Ceccolini. However, the direct surveillance of the flower shop had ceased a year before Biro's search and there is no testimony that Agent Emory was aware of the recorded phone call between Ceccolini and Millow when he interviewed Miss Hennessy. Judge Gagliardi obviously felt that the illegal search triggered the phase of the investigation that focused on Ceccolini. His conclusion that the previous investigation did not purge the taint from Miss Hennessy's testimony was a justifiable one.

■ Citing *Wong Sun v. United States,* 371 U.S. 471, 486, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and *United States v. Brignoni-Ponce,* 422 U.S. 873, 876 n.2, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Government also claims that the testimony of Lois Hennessy "was an act of free will sufficient to purge the taint of any unlawful invasion that may have occurred on December 18, 1974."[6] The Government stresses that Miss Hennessy's testimony was not coerced, that Agent Emory did not know that Biro's search had been illegal, and that Biro's conduct was hardly purposeful or flagrant. See *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d

---

6. Brief of the United States of America, at 8.

416 (1975). However, we do not believe that the cited cases and the emphasized facts require us to reverse the trial judge here. Only a few months ago, we analyzed and rejected much the same arguments and affirmed a similar suppression of evidence. *United States v. Karathanos,* 531 F.2d 26, 34–35 (2d Cir.), *cert. denied,* — U.S. —, 96 S.CT. 3221, 49 L.Ed.2d 1217 (1976). See also *United States v. Tane,* 329 F.2d 848 (2d Cir. 1964), discussed at length in *Karathanos.*[7] The Government responds that in *Karathanos* and *Tane,* the witnesses whose testimony was uncovered by the illegal search were pressured into testifying, while Miss Hennessy was not. At oral argument, Ceccolini's counsel disputed the Government's version of what occurred in this case. We need not deal with the issue at length. We doubt that this point was pressed in the district court, because the judge made no specific findings regarding Lois Hennessy's state of mind.[8] But even if the argument had been made, we do not regard it as dispositive under the precedents cited above. *Cf. United States v. Kurzer,* 534 F.2d 511, 518 (2d Cir. 1976). In any event, the road to Miss Hennessy's testimony from Officer Biro's concededly unconstitutional search is both straight and uninterrupted, and we would not hold her testimony admissible merely because her co-operation with the Government was not coerced.[9]

■ Finally, the Government argues that the rule excluding the fruit of an illegal search is inappropriate in a perjury prosecution, especially when the perjury occurred after the illegal intrusion. Citing *United States v. Raftery,* 534 F.2d 854 (9th Cir. 1976), and *United States v. Turk,* 526 F.2d 654 (5th Cir. 1976), the Government contends that suppression serves no deterrent purpose when the search precedes the crime and that perjury cannot be condoned in any event.

We put to one side the Government's failure to raise this issue in the trial court, although we view that omission with somewhat more gravity than the Government apparently does. We are fully in sympathy with the Government's plea that perjury not be condoned. But we see no sufficient basis for distinguishing trials of perjury charges from trials on charges of other serious crimes to which the exclusionary rule would apply in the Government's direct case at trial. If the Government's position were accepted, then logically the exclusionary rule would also be nullified for any crime that occurred after the illegal search. Whatever may be the future of the exclusionary rule,[10] we do not understand the Government's position to be the law.[11]

7. *Karathanos* takes note of *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), and *Wong Sun,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

8. The Government's only reference to this issue in its memorandum of law submitted to Judge Gagliardi concerning the suppression of Miss Hennessy's testimony appears in a footnote in the "Conclusion" of a 14-page memorandum.

9. The recent decision of a panel of this court in *United States v. Mullens,* 536 F.2d 997 (2d Cir. 1976), is distinguishable. The panel held that statements of a defendant, who presented himself at a police station following an illegal search of his home and the arrest of his parents, were "sufficiently a product of [the defendant's] free will to purge the taint of the earlier, illegal search. . . ." *Id.* at 1000. In *Mullens,* the defendant came forward on his own, and the question was whether his own voluntary statements could be used against him. In this case, the government agent exploited the illegally obtained information by seeking out Lois Hennessy and asking questions directly related to the illegal search.

10. See, e. g., Kaplan, The Limits of the Exclusionary Rule, 26 Stan.L.Rev. 1027 (1974).

11. In attacking "the tattered curtain of the exclusionary rule," our dissenting brother relies heavily on *Stone v. Powell,* — U.S. —, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), and *United States v. Janis,* — U.S. —, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). But the former opinion reaffirms the exclusionary rule in a direct criminal appeal, — U.S. at —, 96 S.Ct. 3037, which is what we have here. And the latter opinion merely refused to "extend" the exclusionary rule to a civil proceeding brought by or against the United States Government when the evidence was illegally seized by state officers.

Moreover, this is not a case, such as *Raftery* or *Turk,* in which an immunized witness was aware of an illegal search and thereupon made use of that knowledge to perjure himself with impunity. Rather, Ceccolini had no inkling of Biro's actions, and was in fact given comforting assurances by the Government that he was not a target of the grand jury's inquiry. Finally, we disagree with the Government's contention that the exclusionary rule serves no purpose here. Thus, we hold that it was proper to suppress Miss Hennessy's testimony in this perjury prosecution.

Judgment affirmed.

VAN GRAAFEILAND, Circuit Judge (dissenting):

"Such is the irresistible nature of truth", said Thomas Paine, "that all it asks, and all it wants, is the liberty of appearing." [1] Nowhere, I submit, is it more important that truth be given the "liberty of appearing" than in the administration of justice. Accordingly, because my brothers continue to draw the tattered curtain of the exclusionary rule ever tighter in the face of truth, I must once again record my dissent.

The Supreme Court's most recent pronouncement of the exclusionary rule is *Stone v. Powell,* —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). There the Court said at p. ——, 96 S.Ct. at 3049:

> The costs of applying the exclusionary rule even at trial and on direct review are well known: the focus of the trial, and the attention of the participants therein, is diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding . . . Application of the rule thus de-

flects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice.

In the instant case, the defendant, convicted of perjury, is set free because the testimony of a witness, given freely and without coercion, is stricken from the record. How far have we come from the ennobling statement of Benjamin Disraeli that "Justice is truth in action"? How much farther can we go before we generate the "disrespect for the law and administration of justice" which is the concern of the Supreme Court?

Our nation's highest court has firmly committed itself to the proposition that statements voluntarily offered as acts of free will may be received despite a primary taint which might otherwise have made them inadmissible. *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).[2] In *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the Supreme Court held that the "fruit of the poisonous tree" doctrine did not require the exclusion of the testimony of a witness who was identified by the defendant while being interrogated without proper *Miranda* warn-

---

1. Foner, The Complete Writings of Thomas Paine, 354 (1945).

2. Although the Government's trial memorandum dealt primarily with the independent source issue, it clearly advanced the possibility that "Miss Hennessy might have inculpated the defendant to the Government of her own voli-

tion." The majority correctly points out in a footnote that this argument was set forth in a footnote. However, it must be apparent to the person reading these lines that the contents of footnotes do not escape the attention of careful judges and practitioners.

ings. The Court said at 447–448, 94 S.Ct. at 2365:

> The statements actually made by respondent to the police, as we have observed, were excluded at trial in accordance with *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Whatever deterrent effect on future police conduct the exclusion of those statements may have had, we do not believe it would be significantly augmented by excluding the testimony of the witness Henderson as well.

*See also United States v. Brignoni-Ponce,* 422 U.S. 873, 876 n.2, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

Although this Circuit has declined to adopt a rule that the testimony of a living witness is per se admissible despite underlying taint, *United States v. Kurzer,* 534 F.2d 511, 518 (2d Cir. 1976),[3] it has recognized that a truly voluntary decision to speak is sufficient to break the causal chain between an illegal search and the statements made. *United States v. Mullens,* 536 F.2d 997 (2d Cir. 1976). This "attenuation-of-the-taint" doctrine is consistent with the balancing of the "public interest in determination of truth at trial" against the "incremental contribution . . . to the protection of Fourth Amendment values by application of the [exclusionary] rule". *Stone v. Pow-*

*ell, supra,* —— U.S. at ——, —— n.26, 96 S.Ct. at 3049 n.26.

Here the witness' "willingness to cooperate with the FBI"[4] was clearly established. The interview with Agent Emory that led to her testimony took place fully four months after the Biro incident, in the calm atmosphere of her home and in the presence of her family. Her narration of the events of December 18 came, not in response to questions referring to that date or to Officer Biro, but rather to a general inquiry as to whether she remembered an incident in December. When asked if she would be willing to help the Government, she replied without hesitation in the affirmative, adding that she was studying police science in college and that she was interested in police work. A careful review of the trial transcript shows her to have been anything but an unwilling witness, a fact highlighted by her statements that she had placed bets with appellant, statements potentially adverse to her penal interests.

The majority appears to concede that this testimony was not coerced and that the witness was not pressured into testifying but finds this not to be dispositive of the issue before us, relying principally on *United States v. Karathanos,* 531 F.2d 26 (2d Cir.), *cert. denied,* —— U.S. ——, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976) and *United*

---

**3.** There is a marked difference on this point between our holdings and those of the District of Columbia Circuit which should, perhaps, be resolved by the Supreme Court. *See, e.g., Brown v. United States,* 126 U.S.App.D.C. 134, 375 F.2d 310 (D.C. Cir. 1966), *cert. denied,* 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967); *Smith v. United States,* 117 U.S.App.D.C. 1, 324 F.2d 879 (D.C. Cir. 1963), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964). In *Smith,* at 881, then Judge Burger said:

> Here no confessions or utterances of the appellants were used against them; tangible evidence obtained from appellants, such as the victim's watch, was suppressed along with the confessions. But a witness is not an inanimate object which like contraband narcotics, a pistol or stolen goods, "speak for themselves." The proffer of a living witness is not to be mechanically equated with the

proffer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence. (Footnotes omitted).

**4.** Assuming that the quoted language from Judge Gagliardi's opinion cannot be construed to be a finding concerning the state of mind of the witness, "the trial resulted in a record of amply sufficient detail and depth from which the determination may be made." *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975).

*States v. Tane,* 329 F.2d 848 (2d Cir. 1964). However, in both *Karathanos* and *Tane* we carefully pointed out that the testimony precluded was coerced and not the product of an act of free will. In my view, the result reached by the majority can only be attributed to its disenchantment with the attenuation rule itself, not the application of the rule to the facts of this case. Like it or not, this rule has repeatedly been approved by the Supreme Court, and its most recent decisions, such as *Stone v. Powell, supra,* show no disposition to retreat from such approval.[5]

In *United States v. Janis,* —— U.S. ——, ——, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), Mr. Justice Blackmun, speaking for the majority said:

> There comes a point at which courts, consistent with their duty to administer the law, cannot continue to create barriers to law enforcement in the pursuit of a supervisory role that is properly the duty of the Executive and Legislative Branches.

When a court prohibits a willing witness from bringing the truth to light solely because she was employed at a place where a school patrol officer impulsively peeked into an open envelope in plain view before him, I think that point has been reached.

I dissent.

---

**5.** In *Stone,* —— U.S. at —— n.26, 96 S.Ct. 3037 n.6. Mr. Justice Powell, citing *Brown v. Illinois, supra,* and *Wong Sun v. United States, supra,* stated that the "attenuation-of-the-taint" doctrine is consistent with the balancing approach to the exclusionary rule, the approach advocated by that Court.